## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

600 CLEVELAND, LLC,

      Plaintiff,

v.                                                                    Case No. 8:24-cv-1652-KKM-AAS

BANK OF AMERICA, N.A.,

      Defendant.

_____

## **ORDER**

      Each dissatisfied with the other's performance under a lease agreement, 600 Cleveland, LLC, and Bank of America, N.A. (BANA), sued one another. Both move for summary judgment and to disqualify experts. I grant BANA's motion for summary judgment as to 600 Cleveland's sole claim because 600 Cleveland seeks damages barred by Florida law and fails to identify evidence of causation. Because BANA's accounting expert, Chelepis, is qualified, uses a reliable methodology, and would be helpful to the trier of fact, I deny 600 Cleveland's *Daubert* motion. In the light of concluding that the statute of limitations bars BANA from recovering damages incurred before July 18, 2019, and accepting Chelepis's testimony, the only evidence for BANA's counterclaim for breach of contract establishes that BANA is entitled to judgment as a matter of law as to its overpayments in 2020 and 2021. Thus, I also grant in

part BANA's motion for summary judgment as to its counterclaim and grant in part 600 Cleveland's motion for summary judgment.

## I.    BACKGROUND

600 Cleveland owned a commercial office building located at 600 Cleveland Street, Clearwater, Florida 33601 from September 9, 2013, to April 1, 2024. Joint Statement of Undisputed Facts (JSUF) (Doc. 82) ¶ 2. BANA and 600 Cleveland assumed a lease agreement originally entered into by other parties on December 1, 1986, and both were bound by the agreement. *See id.* ¶ 1. BANA and its predecessors-in-interest occupied a portion of the building. *Id.* ¶ 3. The initial lease term began on December 1, 1986. *Id.* ¶ 4. The final term under the lease ended on November 30, 2021. *Id.* ¶ 6. From 1986 to 2016, the parties and their predecessors-in-interest executed at least nine amendments to the lease. *Id.* ¶¶ 7–12.

The lease required that BANA surrender the premises "broom swept clean in the same condition as at the commencement of the initial term normal wear and tear and casualty loss only excepted." Pl.'s Statement of Undisputed Facts (Pl.'s SUF) (Doc. 89) ¶ 1.

Under the lease, BANA had to make estimated payments of its share of the building's operating costs "simultaneously with the monthly payments of the basic annual rent." Lease § 5 (Doc. 82-2) at 5. According to the lease, "[a]fter the end of each lease year, or such shorter accounting period as [600 Cleveland]

may determine in [its] sole discretion, [600 Cleveland] shall deliver to [BANA] a statement showing the amount of the Building's Operating Cost for the subject period, and further showing [BANA's] share thereof. Such determination made in good faith by [600 Cleveland] and not patently erroneous shall be binding." *Id.* The lease then provided directions on how each party should address inevitable under- or overpayment. *See id.*

600 Cleveland used a property management company, Jacob Real Estate Services, Inc. (JRES), to manage the building. JSUF ¶¶ 29, 33. JRES kept 600 Cleveland's books and records, forecasted operating expenses, and determined each tenant's share of the operating costs. Pl.'s SUF ¶ 10.

Around June 2021, BANA notified 600 Cleveland that it would not renew the lease. JSUF ¶ 31. 600 Cleveland claims damages related to several aspects of the building that it alleges that BANA failed to restore to the building's condition at the start of the initial lease term. *See id.* ¶¶ 14–27; Pl.'s Suppl. Resps. to Def.'s Interrog. (Doc. 82-9) at 6–9.

Following BANA's notice to 600 Cleveland, the parties engaged in a series of discussions regarding the decommissioning projects and the state of the leased premises. *See* Pl.'s SUF ¶¶ 21–38. These discussions included pre-suit mediation, which did not resolve the dispute. *See id.* ¶¶ 33–34.

600 Cleveland views the downtown Clearwater area as a declining commercial real estate market. Def.'s Statement of Undisputed Facts (Def.'s

3

SUF) (Doc. 83) ¶¶ 37–38. Accordingly, on April 1, 2024, it sold the building on an "as-is" basis as part of a larger portfolio sale. *Id.* ¶¶ 41, 45, 49. The building was not listed for sale when Clearwater Offices, LLC, and CW Downtown Properties, LLC, made an offer to 600 Cleveland to purchase several parcels of real property, including the building. *Id.* ¶¶ 39–40. 600 Cleveland accepted the first and only offer it received. *Id.* ¶ 41. The total offer for the real property portfolio was $57,750,000.00. *Id.* ¶ 39. Of the total, approximately $33,200,000.00 was for the building and its adjoining parking lots. *Id.* ¶ 42. For perspective, in 2013, 600 Cleveland purchased the building for approximately $7,350,000.00. *Id.* ¶ 43.

The purchase agreement for the building listed a few "Disclosed Repairs" that the purchasers could choose to perform during the pendency of the sale. *See* Def.'s SUF ¶¶ 48–49; Ikajevs Dep. (Doc. 82-3) Ex. 4 at § 1.4. If they did so, the repair costs would be credited against the purchase price. *See* Def.'s SUF ¶¶ 48–49; Ikajevs Dep. Ex. 4 at § 1.4. The Disclosed Repairs included one deficient condition that 600 Cleveland complains about in this suit. *See* Def.'s SUF ¶ 48; JSUF ¶¶ 14, 24, 45; Ikajevs Dep. Ex. 4 at § 1.4(b)(iv). 600 Cleveland performed no maintenance or repairs related to any of the deficient conditions for which it now seeks damages in this lawsuit, and no repairs or alterations have been made to the building related to any of the alleged deficient conditions. *See* Def.'s SUF ¶¶ 50–51.

On May 23, 2024, 600 Cleveland sued BANA for breach of the lease agreement. *See* Pl.'s SUF ¶ 42; Compl. (Doc. 1-1). BANA removed the suit to this Court and then counterclaimed for breach of contract, recoupment, and an accounting. *See* Notice of Removal (Doc. 1); Answer & Countercls. (Doc. 9). On April 28, 2025, I granted in part 600 Cleveland's motion to dismiss and strike affirmative defenses and dismissed the accounting counterclaim and struck one of BANA's affirmative defenses. Order (Doc. 43) at 32.

BANA moves for summary judgment on 600 Cleveland's claim and its own counterclaims. Def.'s MSJ (Doc. 81). BANA also moves to disqualify 600 Cleveland's experts on the cost of repairing the building's allegedly deficient conditions, John Jahreis and Darren Azdell, and to exclude Jahreis's report. Def.'s *Daubert* Mot. (Doc. 80). 600 Cleveland opposes both. *See* Pl.'s Resp. to MSJ (Doc. 102); Pl.'s Resp to *Daubert* Mot. (Doc. 101). 600 Cleveland moves for summary judgment on BANA's counterclaims and affirmative defenses. Pl.'s MSJ (Doc. 85) at 1. 600 Cleveland also moves to disqualify BANA's appraisal expert, David Taulbee, Pl.'s Taulbee *Daubert* Mot. (Doc. 73), BANA's expert on the cost of repairing the building, Pasha Ameli, Pl.'s Ameli *Daubert* Mot. (Doc. 78), and BANA's accounting and financial reconciliation expert, Tracy Chelepis, Pl.'s Chelepis *Daubert* Mot. (Doc. 79). BANA opposes each. Def.'s Resp. to MSJ (Doc. 99); Def.'s Resp. to Taulbee *Daubert* Mot. (Doc. 97); Def.'s Resp. to Ameli *Daubert* Mot. (Doc. 95); Def.'s Resp. to Chelepis *Daubert* Mot.

5

(Doc. 96). BANA filed a reply in support of its motion for summary judgment. Reply (Doc. 106). 600 Cleveland did not.

## II.   LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate a lack of genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, and so on) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Because this case is "slated for a bench trial[,] where 'there are no issues of witness credibility[,]' [I] may conclude 'on the basis of the affidavits,

depositions, and stipulations before [me], that there are no genuine issues of
material fact' and grant summary judgment, 'even though [my] decision may
depend on inferences to be drawn from what has been incontrovertibly
proved.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242,
1252 (11th Cir. 2016) (quoting *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–
24 (5th Cir. 1978)). "When 'there are neither issues of credibility nor
controversies with respect to the substance of the proposed testimony,' a 'trial
on the merits would reveal no additional data,' and '[h]earing and viewing the
witnesses subject to cross-examination would not aid [my] determination.'" *Id.*
(quoting *Nunez*, 572 F.2d at 1124). Under such circumstances, I am "in a
position to and ought to draw [my] inferences without resort to the expense of
trial," including, if warranted, inferences against the non-moving party. *See id.*
(quoting *Nunez*, 572 F.2d at 1124).

## III.   ANALYSIS

### A. 600 Cleveland's Breach Claim

BANA argues for summary judgment on 600 Cleveland's breach claim
on the grounds that there are no genuine issues of material fact, 600 Cleveland
cannot establish recoverable damages as a matter of law, and it has not put
forth evidence from which a reasonable factfinder could conclude that BANA
breached the lease. *See* Def.'s MSJ at 3–19, 21–23. 600 Cleveland responds that
Florida law allows for the damages it seeks and that it has put forth sufficient

evidence to find that BANA breached the lease. *See* Pl.'s Resp. to MSJ at 4–15.
Because I agree with BANA's damages arguments, I need not consider the
breach question and grant BANA's motion for summary judgment as to 600
Cleveland's breach claim.

A plaintiff asserting a breach of contract claim must show damages
caused by the defendant's alleged breach. *See, e.g.*, *People's Tr. Ins. Co. v.
Alonzo-Pombo*, 307 So. 3d 840, 843 (Fla. 3d DCA 2020). Further, Florida law
does not allow for windfall recoveries in contract actions. *See MCI Worldcom
Network Servs., Inc. v. Mastec, Inc.*, 995 So. 2d 221, 223–24 (Fla. 2008) (per
curiam) ("A plaintiff, however, is not entitled to recover compensatory damages
in excess of the amount which represents the loss actually inflicted by the
action of the defendant."); *Feldkamp v. Long Bay Partners, LLC*, 773 F. Supp.
2d 1273, 1285 (M.D. Fla. 2011) ("[The injured party] is not entitled to be placed,
because of the breach, in a position better than that which he would have
occupied had the contract been performed."), *aff'd*, 453 F. App'x 929 (11th Cir.
2012) (per curiam).

600 Cleveland claims that BANA breached the lease agreement by
failing to deliver the premises in the same condition as they existed on
December 1, 1986. Compl. ¶ 11. Because of this alleged breach, 600 Cleveland
seeks to recover the costs of restoring the building to its 1986-condition. *See id.*
¶¶ 11–15. 600 Cleveland also seeks to recover rent that it claims to have lost

because BANA left the premises in an untenantable condition. Pl.'s Suppl. Resps. to Def.'s Interrog. at 12–13; Pl.'s Resp. to MSJ at 4–5. It cannot recover either.

### 1. Restoration Damages

As a preliminary matter, 600 Cleveland does not seek to recover, and produces no evidence of, any damages from diminution in the value of the building from BANA's actions. Nor does it contest BANA's argument and evidence that "[t]here is no diminution in value." Def's MSJ at 9; *see id.* at 5–7 (arguing and presenting evidence of no diminution in value). Instead, 600 Cleveland argues that, under Florida law, it can obtain restoration damages regardless. *See* Pl.'s Resp. to MSJ at 5–7.

As BANA points out, 600 Cleveland has no evidence that it could have sold the building for more had the repairs to the premises that BANA vacated been made before the sale. *See* Def.'s MSJ at 5. 600 Cleveland sold the building "as-is" in an off-market sale of a larger real property portfolio, and it accepted the first and only purchase offer it received. Def.'s SUF ¶¶ 39–41, 45, 49. Further, the Disclosed Repairs in the purchase and sale agreement for the building reveal that the purchaser viewed only one of the conditions that 600 Cleveland complains about—wood paneling in the place of windows where an ATM was once located—as a potential issue. *See id.* ¶ 48; JSUF ¶¶ 14, 24, 45; Ikajevs Dep. Ex. 4 at § 1.4(b)(iv). Ultimately, as BANA argues and 600

9

Cleveland does not contest, the purchaser chose not to exercise its right to replace the wood paneling with windows and receive a credit against the purchase price. Def.'s MSJ at 6. Thus, BANA has shown, and 600 Cleveland does not contest, that the alleged deficiencies in the condition of the leased premises caused no devaluation of the building.

Under certain circumstances, Florida law allows for the recovery of the cost of restoring leased premises to the condition called for in a lease agreement. *See, e.g.*, *Smith v. Austin Dev. Co.*, 538 So. 2d 128, 129 (Fla. 2d DCA 1989); *Cunningham Drug Stores, Inc. v. Pentland*, 243 So. 2d 169, 170 (Fla. 4th DCA 1970). The question here is whether Florida law allows for the recovery of restoration damages when the plaintiff did not make any of the needed repairs, sold the premises before bringing suit, the evidence shows that the allegedly deficient conditions did not diminish the value of the premises, and the plaintiff does not dispute the defendant's assertion that "there is no diminution in value." Because recovery under such circumstances amounts to a windfall for the plaintiff, Florida law does not allow it.

In diversity cases, federal courts must "ascertain and apply" state common law as the state courts declare the law to be. *Fid. Union Tr. Co. v. Field*, 311 U.S. 169, 177 (1940). In other words, in "adjudicating a matter of state law in a diversity suit," a federal court acts like "only another court of the

State." *King v. Ord. of United Com. Travelers of Am.*, 333 U.S. 153, 161 (1948) (quoting *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 108 (1945)).

Because the "highest state court is the final authority on state law," *Field*, 311 U.S. at 177, ordinarily a federal court sitting in diversity first looks to state supreme court precedent, *see Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005) ("Our objective is to determine issues of state law as we believe the Florida Supreme Court would."). If the state supreme court has spoken, then a federal court must "follow its rule." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011).

Absent state supreme court precedent, a federal court "look[s] to decisions of the state's intermediate court of appeals for guidance." *Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1301 n.7 (11th Cir. 2023). Although these decisions are not binding on a federal court, *Comm'r v. Bosch's Est.*, 387 U.S. 456, 465 (1967), "[w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise," *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940). In reaching that determination, federal courts may consider "such sources as the Restatements of Law, treatises and law review commentary,

and the majority rule." *Putman v. Erie City Mfg. Co.*, 338 F.2d 911, 917 (5th Cir. 1964) (quotation omitted).[1] A federal court must "choose the rule which it believes the state [supreme] court, from all that is known about its methods of reaching decisions is likely in the future to adopt." *Id.* (quotation omitted). This endeavor requires use of "judicial brains, not a pair of scissors and a paste pot." *Id.* at 918 (quoting Arthur L. Corbin, *The Laws of the Several States*, 50 YALE L.J. 762, 775 (1941)).

No Supreme Court of Florida opinion addresses whether recovery of damages is permissible in this contract context. There is one Florida intermediate appellate court opinion dealing with a nearly identical question, and, throughout this litigation, 600 Cleveland has relied on it for support of its right to recover restoration damages despite never repairing the deficient conditions, selling the building before suing, and failing to counter the defendant's evidence and argument that there is no diminution in value of the premises. BANA argues that this case, *Pomeranc v. Winn-Dixie Stores, Inc.*, 598 So. 2d 103 (Fla. 2d DCA 1992), does not control because allowing 600 Cleveland to recover its asserted $2.7 million in restoration damages, under

---

[1] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

such circumstances, would run afoul of Florida's prohibition on windfall recoveries in contract actions. Def.'s MSJ at 6–9.

In *Pomeranc* a lessee failed to leave the premises in good repair upon termination of the lease. 598 So. 2d at 104. The lessor sold the premises to a third party and then sued the lessee for damages for leaving the premises in disrepair. *Id*. According to the lessee, the purchase price for the property was contingent on the lessor's promise that the lessee would either return as a tenant of the purchaser or restore the property to the condition required by the former lease. *Id*. The Fifth District Court of Appeal reversed the trial court's grant of summary judgment for the lessee, holding that the proper measure of damages was the cost of restoration, not diminution in value, regardless of whether the premises were restored or the terms of the third-party promise with the purchaser. *Id*.

*Pomeranc* is a case forgotten by Florida state courts. None have cited or discussed it. 600 Cleveland interprets the lack of engagement as proof of *Pomeranc*'s authoritativeness: "No court has overruled, questioned, limited or found other fault with *Pomeranc*." Pl.'s Resp. to MSJ at 6. Prior to this litigation, only one federal court applying Florida law had cited it. *See Apple Glen Invs., L.P. v. Express Scripts, Inc.*, No. 8:14-CV-1527-T-33EAJ, 2016 WL 909322 (M.D. Fla. Mar. 10), *judgment entered*, 2016 WL 4702428 (M.D. Fla. Sept. 8, 2016), and *aff'd*, 700 F. App'x 935 (11th Cir. 2017) (per curiam). 600

Cleveland makes much of that single favorable treatment of *Pomeranc*. Pl.'s
Resp. to MSJ at 6. But that action is materially distinguishable from this one.
There, the lessor continued to own the property, and the court did not address
any argument concerning a potential windfall recovery for the plaintiff. *See*
2016 WL 909322, at *15. Further, the court relied on *Pomeranc* for the
proposition that a lessor is under no obligation to the former lessee to use
money recovered as damages to repair the property. *Id.* This is not the key
issue here.

In concluding that the restoration costs were the proper measure of
damages, *Pomeranc* relied upon older editions of American Jurisprudence and
the American Law Reports. *See* 598 So. 2d at 104. As BANA points out, current
versions of the treatises clarify that restoration damages are appropriate for
breach of covenants to leave leased property in a particular condition only
when they do not exceed the diminution in value of the property or result in a
windfall to the lessor.[2] *See* 49 Am. Jur. 2d *Landlord and Tenant* § 707 (2025);
45 A.L.R. 5th 251 (1997). Indeed, the American Law Reports notes multiple
decisions in which the court "denied damages for a lessee's breach of a covenant
as to repairs where the lessor was subsequently able to sell the premises to a

---

[2] 600 Cleveland accuses BANA of misstating the relevant American Jurisprudence
section. Pl.'s Resp. to MSJ at 6. It is 600 Cleveland, not BANA, that omits the relevant
caveat included in the treatise, and thereby misstates the point of law reflected
therein.

third party at a price unaffected by the absence of repairs." William H. Danne, Jr., Annotation, *Measure and Elements of Damages for Lessee's Breach of Covenant as to Repairs*, 45 A.L.R. 5th § 11(d) (1997). As such, the sources upon which *Pomeranc* relied now undermine the opinion's reasoning by adopting a different approach to avoid windfall recoveries.

More importantly, Supreme Court of Florida opinions, both pre- and post-dating *Pomeranc*, do not allow windfall recoveries or damages that result in economic waste in contract actions. *See MCI Worldcom Network Servs., Inc.*, 995 So. 2d at 223–24; *Grossman Holdings Ltd. v. Hourihan*, 414 So. 2d 1037, 1039 (Fla. 1982) (holding that "the reasonable cost of construction and completion in accordance with the contract" is available only if it "is possible and does not involve unreasonable economic waste"). Those opinions cut sharply against *Pomeranc* as evidence of what Florida law permits here. After *Pomeranc*, the Fifth District Court of Appeal too has agreed with this principle in a separate contract context. *See Orkin Exterminating Co. v. DelGuidice*, 790 So. 2d 1158, 1159–60 (Fla. 5th DCA 2001) (holding that the measure of damages for breach of a residential services contract is the lesser of the diminution in value or the cost of repair, and emphasizing that "[t]he purpose of providing an alternative method of computing damages on the basis of diminution in value . . . is to prevent economic waste and to prevent, as well, potential windfalls to plaintiffs."). Further, in Florida, when a plaintiff seeks

to recover damages for harm to their real property outside the contract context, the damages are also measured by either the diminution in value or the costs of restoring the property, and, when one measure exceeds the other, private plaintiffs are generally limited to recovering the lesser. *See Davey Compressor Co. v. City of Delray Beach*, 639 So. 2d 595, 596 (Fla. 1994) (explaining that this approach prevents overcompensating plaintiffs).

I must "decide novel questions of state law 'the way it appears the state's highest court would.'" *Freeman v. First Union Nat.*, 329 F.3d 1231, 1232 (11th Cir. 2003) (per curiam) (quoting *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001)). Although *Pomeranc* might provide evidence as to that answer, in some cases there exists a "persuasive indication that the state's highest court would decide the issue otherwise." *Id.* (quoting *Ernie Haire Ford*, 260 F.3d at 1290). Such is this case. To conclude that *Pomeranc* controls and 600 Cleveland may recover restoration damages when the evidence shows that there is no diminution in value would run counter to the Supreme Court of Florida's consistent precedent that Florida law does not allow for windfall recoveries in contract actions. Thus, plaintiffs must accept the lesser of diminution in value and restoration damages when they differ.

Because of the above, 600 Cleveland may not recover restoration damages in this action.

### 2. Lost Rent

600 Cleveland also seeks to recover rent that it claims it could not collect over the twenty-eight months from BANA's vacating the premises to the sale of the building. *See* Pl.'s Suppl. Resps. to Def.'s Interrog. at 14. This rent was lost, 600 Cleveland asserts, because BANA left the premises in an untenantable state. Pl.'s Resp. to MSJ at 4–5. BANA argues that 600 Cleveland is not entitled to lost rent damages because the vacancy was not caused by the alleged deficient conditions and 600 Cleveland failed to mitigate its damages by not repairing any of the conditions that it claims rendered the premises untenantable. Def.'s MSJ at 21–23.

In response, 600 Cleveland makes only passing reference to the argument in what amounts to a summary of its positions in the litigation. *See* Pl.'s Resp. to MSJ at 4–5. 600 Cleveland offers the conclusory statement that the "deficiencies prevented 600 Cleveland from leasing the Leased Premises to another tenant, and deprived 600 Cleveland of basic rent for all months beginning December 1, 2021 through March 31, 2024 (28 months)." *Id.* at 4. 600 Cleveland then states that it is entitled to rent at the rate BANA paid for those 28 months. *Id.* at 4–5. 600 Cleveland does not identify evidence that the alleged deficiencies proximately caused the vacancies. It does not even identify evidence of any efforts to lease the space to new tenants. 600 Cleveland

17

essentially ignores BANA's arguments regarding the lack of causation or failure to mitigate.

600 Cleveland has conceded the argument regarding the lost rent by failing to do more than raise a conclusory denial. *See* FED. R. CIV. P. 56(e)(3); *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 432–34 (11th Cir. 2014) (per curiam) (affirming summary judgment that the trial court granted because the plaintiffs failed to respond to the defendant's specific argument for summary judgment); *Schwarz v. Bd. of Supervisors on behalf of Villages Cmty. Dev. Districts*, 672 F. App'x 981, 983 (11th Cir. 2017) (per curiam) (same).

Even if 600 Cleveland had not conceded the argument, its conclusory statement that the deficiencies prevented it from leasing the premises to a new tenant would be insufficient. *See, e.g.*, *Sumrall v. Georgia Dep't of Corr.*, 154 F.4th 1304, 1313 (11th Cir. 2025), *petition for cert filed*, (No. 25-6517); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value [at the summary judgment stage.]"). In response to BANA's motion, 600 Cleveland has presented no evidence of a genuine dispute of material fact regarding causation for its lost rent theory—indeed it has presented no evidence at all. No reasonable factfinder could find for 600 Cleveland on lost rent damages.

Because 600 Cleveland has no recoverable damages caused by BANA's alleged breach of the lease agreement, I grant BANA's motion for summary judgment as to 600 Cleveland's sole cause of action. I deny as moot 600 Cleveland's *Daubert* motions regarding Taulbee and Ameli, and its motion for summary judgment as to BANA's affirmative defenses. I likewise deny as moot BANA's *Daubert* motion regarding 600 Cleveland's experts.

### B. BANA's Counterclaims

As a preliminary matter, BANA's counterclaim for recoupment is dismissed as moot because 600 Cleveland cannot recover on its claim.

Both parties move for summary judgment on the remaining counterclaim for breach of the lease agreement. Def.'s MSJ at 23–25; Pl.'s MSJ at 5–10. BANA's claim is that the lease required 600 Cleveland to provide end-of-the-year statements on BANA's share of the building's operating costs for reconciliation purposes. *See* Am. Answer & Countercls. (Doc. 24) ¶ 30 (Countercls.). BANA asserts that 600 Cleveland did not provide these statements. *Id.* ¶ 32 (Countercls.). As a result, 600 Cleveland overcharged BANA for operating costs and kept these overpayments despite BANA's demands that they be returned. *See id.* ¶¶ 33–34 (Countercls.). Because 600 Cleveland did not provide the required statements and withheld overpayments from BANA, it allegedly breached the lease. *See id.* ¶¶ 32, 35 (Countercls.).

BANA argues that 600 Cleveland did not reconcile the operating costs on an annual basis as the lease required. Def.'s MSJ at 23. BANA relies on its accounting expert, Chelepis, and avers that he reviewed the relevant records and determined that 600 Cleveland failed to provide timely reconciliations to BANA for several years and improperly charged BANA for various costs that should not have been included according to the parties' lease agreement. *Id.* at 23–24. Because 600 Cleveland has not offered its own expert or any "significant, probative evidence" to demonstrate a triable issue of fact, BANA contends that it is entitled to summary judgment. *Id.* at 25.

For its part, 600 Cleveland claims that it provided the required statements and identifies testimony from James Jacob, Jr., the president of JRES, in support. Pl.'s MSJ at 5. It also claims that BANA is precluded from proving that 600 Cleveland failed to provide the statements because, when asked at his deposition if it was BANA's position that 600 Cleveland did not provide the statements, BANA's corporate representative responded, "I don't know." *Id.* at 5–6. 600 Cleveland does not identify any precedent holding that such an answer from a corporate representative precludes the party from making out its case. It repeats this argument later in its motion and never explains further. *See id.* at 7–8. In the absence of developed reasoning, explanation, or case law in support, I decline to consider this argument. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (declining

to address a "perfunctory and underdeveloped" argument that the party did not elaborate on or support with any legal authority). And, in any event, BANA clarifies in its response that it objected to at least one of these questions as vague and filed errata sheets to clarify the representative's answers. Def.'s Resp. to MSJ at 4–6; *id.* at 5 n.3.

600 Cleveland continues by averring that JRES, who calculated the operating costs, did so in good faith and that the calculations were not patently erroneous. *See* Pl.'s MSJ at 6–8. Thus, under the terms of the lease, there was no breach. *See id.* In support, 600 Cleveland points to Jacob's declaration, which describes how he calculated the costs. *Id.* at 6–7.

Next, 600 Cleveland argues that the terms of the lease limit BANA's remedies to applying any overpayment to the next payment for operating costs. *Id.* at 8–9. Lastly, 600 Cleveland contends that the statute of limitations bars collecting damages on any overpayments from before July 18, 2019. *Id.* at 9–10.

In its response to BANA's motion, 600 Cleveland repeats most of the arguments made in its motion, except for the statute of limitations argument. *See* Pl.'s Resp. to MSJ at 15–18. Although 600 Cleveland moves to disqualify Chelepis, Pl.'s Chelepis *Daubert* Mot., it does not respond to BANA's argument regarding its expert. *See* Pl.'s Resp. to MSJ at 15–18.

When responding to 600 Cleveland's motion, BANA puzzlingly attempts to retreat from its own assertion that there is no genuine dispute of material fact. *See* Def.'s Resp. to MSJ at 3, 5–6 ("Plaintiff ignores the mountain of evidence showing the disputed nature of [the breach] issue . . . ."). Throughout, BANA casts doubt on the evidence that 600 Cleveland cited in support of its motion. *See id.* at 4–5, 7. BANA then argues that 600 Cleveland's contention that the sole remedy allowed is to apply any overage to the next payment "misstates both the Lease and Florida law." *Id.* at 7–9. 600 Cleveland's statute of limitations argument fails, BANA claims, because the obligation was a continuing obligation, and the claim did not begin accruing until the lease was terminated. *Id.* at 9–11. Thus, it falls within the five-year window to bring contract actions in Florida. *Id.*

### 1. 600 Cleveland's Sole Remedy Theory

600 Cleveland argues that BANA is precluded from recovering any damages from overcharges for the building's operating costs because the lease states that, "[i]n the event the total monthly payments made by Tenant for the Building's Operating Cost . . . exceeds Tenant's proportionate share . . . then Landlord will apply any such overage towards the next succeeding monthly payments of the Building's Operating Cost due from Tenant." Pl.'s MSJ at 8; Lease Agreement § 5 (Doc. 82-2) at 5. In support, 600 Cleveland cites a single, non-binding case considering a contract for the sale of goods that fell under the

22

Florida Uniform Commercial Code for the proposition that there need not be
"magic words" such as "sole remedy" to preclude recoveries for breaches of
contract. *See* Pl.'s MSJ at 8–9; *Jet Sales of Stuart, LLC v. Jet Connection
Travel, GmbH*, No. 06-80039-CIV, 2006 WL 8435439, at *4 (S.D. Fla. Sept. 19,
2006), *aff'd*, 240 F. App'x 839 (11th Cir. 2007) (per curiam).

More persuasive is Florida law holding that parties may contract for
exclusive remedies, but the provisions limiting remedies must be "mutual,
unequivocal and reasonable." *Coastal Computer Corp. v. Team Mgmt. Sys.,
Inc.*, 624 So. 2d 352, 353 (Fla. 2d DCA 1993) (quoting *Greenstein v. Greenbrook,
Ltd.*, 413 So. 2d 842, 844 (Fla. 3d DCA 1982)). Here, there is no such language
limiting the remedies. *See* Lease Agreement § 5 (Doc. 82-2) at 4–5. Further,
given that the provision in question provides guidance to the parties in the
likely event that estimated operating costs payments would, through no fault
of either party, inevitably prove inaccurate at some point during the decades-
long lease, the better reading of the provision is that it is not specifying a
remedy for breach and is instead providing instructions on what to do under
foreseeable circumstances to avoid unnecessary litigation.

The lease provision does not preclude BANA from recovering damages
for any overcharges.

23

### 2.  600 Cleveland's Statute of Limitations Argument

600 Cleveland argues that, because Florida's statute of limitations for contract claims is five years from the date on which the cause of action accrues, and BANA first asserted its counterclaim on July 18, 2024, BANA is barred from recovering for any overcharging before July 18, 2019. Pl.'s MSJ at 9. In response, BANA contends that, by keeping the overpayments instead of applying them to BANA's share of the operating costs in subsequent months, 600 Cleveland breached a continuing obligation. Def.'s Resp. to MSJ at 9–11.

Under Florida law, when the breach is of a continuing obligation, "ongoing nonperformance constitute[s] a continuing breach while the contract remain[s] in effect," and the "cause of action is not limited to the [defendant's] initial breach." *City of Quincy v. Womack*, 60 So. 3d 1076, 1078 (Fla. 1st DCA 2011). Although there appears to be some rhetorical difference in how courts applying Florida law have treated situations such as this one, the outcome is the same under either approach. On the one hand, some courts have found contracts that similarly require repeat future payments to be divisible, with each obligation or owed payment forming its own cause of action with a separate limitations period upon breach. *See, e.g.*, *Access Ins. Planners, Inc. v. Gee*, 175 So. 3d 921, 924 (Fla. 4th DCA 2015) (holding that contract requiring periodic payment of commissions upon receipt of premiums was divisible); *Arlaine & Gina Rockey, Inc. v. Cordis Corp.*, No. 02-22555-CIV, 2004 WL

5504978, at *49 n.15 (S.D. Fla. Jan. 5, 2004) (holding that the obligation to make periodic royalty payments was not a continuing obligation; instead, the obligations were severable); *Hannett v. Bryan*, 640 So. 2d 203, 204 (Fla. 4th DCA 1994) (holding that a contract for annual syndication fee payments was divisible). On the other hand, other courts have concluded that analogous circumstances involved a continuing obligation. *See, e.g.*, *Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP*, 137 So. 3d 1081, 1095 (Fla. 3d DCA 2014) (per curiam) (finding a breach of a continuing obligation when a defendant repeatedly overcharged for annual fees and dues); *Smith v. Casey*, No. 1:12-CV-23795-UU, 2014 WL 11878422, at *5 (S.D. Fla. Oct. 29, 2014) (holding failure to pay recurring royalties is a breach of a continuing obligation); *Bishop v. State, Div. of Ret.*, 413 So. 2d 776, 778 (Fla. 1st DCA 1982) (finding breach of a continuing obligation for failure to make full monthly payments).

This is a distinction without a difference because, even when courts conclude that there is a continuing obligation, the plaintiff is still limited to recovering damages that fall within the five-year limitations period from the date of filing.[3] *See Grove Isle Ass'n, Inc.* 137 So. 3d at 1095; *XP Glob., Inc. v. AVM, L.P.*, No. 16-CV-80905, 2016 WL 4987618, at *3 (S.D. Fla. Sept. 19,

---

[3] Given that, when the contractual obligation at issue requires repeat future actions or payments, the outcome is the same under either method, the better approach is to find such contracts divisible because doing so avoids the confusion that accompanies considerations of whether something is a continuing obligation.

25

2016). Under either approach, BANA may recover damages incurred only in the five years before it filed its counterclaim. Thus, BANA may not recover for any overpayments before July 18, 2019.

### 3. 600 Cleveland's *Daubert* Challenge to Chelepis

Because BANA relies exclusively on Chelepis's testimony and report to prove its counterclaim, should they be inadmissible, 600 Cleveland would be entitled to summary judgment. Accordingly, 600 Cleveland moves to strike Chelepis's Expert Report and to prevent him from testifying at trial. Pl.'s Chelepis *Daubert* Mot. at 1–3. In support, 600 Cleveland makes three arguments: (1) Chelepis's methodology is unreliable; (2) his opinion is *ipse dixit*; and (3) his testimony would not help the trier of fact. *See id.* at 5–6, 13–14, 16–17. In response, BANA asserts that 600 Cleveland misapplies the *Daubert* standard specific to scientific testimony to Chelepis's non-scientific accounting opinion, ignores Chelepis's testimony regarding his audit process in favor of cherry-picked quotes from the deposition, and fails to set forth an actual argument for how Chelepis's testimony would not help the trier of fact. Def.'s Resp. to Chelepis *Daubert* Mot. at 2.

Federal Rule of Evidence 702 governs expert testimony, providing:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

Trial courts must consider if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Thelen v. Somatics, LLC*, 156 F.4th 1115, 1131–32 (11th Cir. 2025) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). The party seeking to introduce the expert at trial bears the burden of establishing qualification, reliability, and helpfulness. *Frazier*, 387 F.3d at 1260. An expert can be qualified to testify about certain matters based on his scientific training, education, knowledge, or experience in the field. *Id.* at 1260–61.

To determine whether an expert's scientific methodology is reliable, courts consider:

> (1) whether the expert's theory can be and has been tested;
> (2) whether the theory has been subjected to peer review and

27

publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Id.* at 1262 (citation omitted). When applicable, these criteria "may be used to evaluate the reliability of non-scientific, experience-based testimony." *See id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). In other cases, "[s]tandards of scientific reliability, such as testability and peer review, [will] not apply to all forms of expert testimony." *Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009). "For nonscientific expert testimony, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 152). "A district court may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.'" *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 150).

Expert testimony generally helps the trier of fact to understand evidence or decide a fact at issue if the testimony "concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. Expert testimony generally will not help the trier of fact if it "offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63. And, of course, simply because expert testimony meets the *Daubert* standard does not mean that the testimony is automatically admitted. *See id.* at 1263.

28

Instead, courts must still consider whether that expert testimony satisfies the other Federal Rules of Evidence. *See id.* When a case will proceed as a bench trial, like here, the Court's gatekeeping function is less of a concern. *See United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

As a preliminary matter, 600 Cleveland does not contest Chelepis's qualifications—nor could it. His extensive education and experience in the fields of accounting, auditing, and real estate qualify him to testify competently on the proper calculation of operating costs charges under a lease. *See* Def.'s Resp. to Chelepis *Daubert* Mot. at 12–13 (detailing Chelepis's education and work experience); Chelepis Report (Doc. 77-1) at 20–21.

Chelepis opines that 600 Cleveland overcharged BANA by $160,882.01 for operating costs over the course of the lease.[4] Chelepis Report at 8. 600 Cleveland attacks his opinion on the basis that his "methodology does not utilize any accepted industry standards that can be verified or tested." Pl.'s Chelepis *Daubert* Mot. at 6. 600 Cleveland argues that Chelepis should be

---

[4] 600 Cleveland did not provide information from which Chelepis could audit the 2020 and 2021 operating costs, so he took the average of the amount that 600 Cleveland overcharged BANA in the years for which he did have information and projected that BANA was overcharged by that average amount for the months that BANA occupied the building in 2020 and 2021. *See* Chelepis Dep. (Doc. 74-1) 93:4–94:14.

barred from testifying because "lease auditing" does not have "articulated industry standards," "peer review processes," or a "regulatory governing body to which his opinions can be tested." *Id.* at 7. 600 Cleveland, again, takes issue with Chelepis's methodology, which essentially boils down to reviewing the lease and its amendments, establishing what kinds of charges could be billed as operating costs and what could not, and then comparing the operating costs invoices to that baseline to see if 600 Cleveland charged BANA contrary to the lease's provisions. *Id.* at 10. 600 Cleveland claims this methodology is unreliable because, to determine what could be charged as operating costs, Chelepis interprets terms in the lease, and, when the lease does not address certain costs, relies on standard industry practices to categorize the costs. *See id.* at 10–12. 600 Cleveland contends that Chelepis's reliance on his knowledge and experience as a CPA, purportedly without further explanation, makes his methodology unreliable. *See id.* at 12–13. 600 Cleveland makes a similar argument that Chelepis's opinion is unreliable because it is *ipse dixit*. *Id.* at 13. Specifically, 600 Cleveland avers that Chelepis's opinion is conclusory and based on nothing more than assumptions and his assurances that the opinion is accurate. *See id.* at 13–16.

In response, BANA correctly identifies that, for non-scientific expert testimony, there need not be articulated industry standards, peer review processes, or a regulatory governing body. *See* Def.'s Resp. to Chelepis *Daubert*

Mot. at 13; *Am. Gen. Life Ins. Co.*, 555 F.3d at 1338 (holding that "standards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony," and that "a district court may decide that nonscientific expert testimony is reliable based upon personal knowledge or experience" (citation modified)). Nor does the fact that Chelepis's methodology requires him to interpret terms in the lease to determine whether certain costs were properly included make his opinion inherently unreliable. *See Maiz v. Virani*, 253 F.3d 641, 666–67 (11th Cir. 2001) (affirming the admission of a forensic accountant's testimony regarding provisions in contracts and the effect of the provisions on the defendants' entitlements to commissions or expenses). Because 600 Cleveland merely states in a conclusory fashion that Chelepis relies on assumptions, it remains unclear which ones 600 Cleveland contests. In any event, experts are entitled to state and rely on reasonable assumptions, like Chelepis does here. *See id.*

Chelepis's deposition testimony also undermines 600 Cleveland's argument that his opinion is *ipse dixit*. *See* Pl.'s Chelepis *Daubert* Mot. at 12–16. Chelepis explained at length the general process he uses to audit leases. *See* Chelepis Dep. (Doc. 74-1) 16:4–21:10. He then reviewed the lease's provisions and amendments and explained how he interpreted and applied them to reach his opinion. *See, e.g.*, *id.* 26:5–27:11, 31:9–34:5, 37:10–46:17, 49:21–59:17, 61:5–71:15. Chelepis similarly explained his accounting

calculations and his underlying reasonable assumptions. *See, e.g.*, *id.* 117:4–130:6. I conclude, given the above, that Chelepis's methodology is reliable and his opinion is not *ipse dixit*.[5]

600 Cleveland's conclusory argument that Chelepis's testimony will not assist the trier of fact fares no better. Pl.'s Chelepis *Daubert* Mot. at 16–17. As the trier of fact, I conclude that Chelepis's testimony would be helpful in navigating the numerous financial records and reconciling them, using accounting principles, with the lease's guidance for what could properly be charged as operating costs.

600 Cleveland's Chelepis *Daubert* motion is denied.

### 4. No Genuine Dispute of Material Fact

In the light of considering 600 Cleveland's other arguments and admitting Chelepis's testimony, I must now determine whether there are genuine disputes of material fact as to any alleged overpayments occurring on or after July 18, 2019.

The lease required BANA to make estimated payments of its share of the building's operating costs "simultaneously with the monthly payments of the

---

[5] Although the *Daubert* reliability inquiry focuses "on the expert's principles and methodology, and not on the conclusions that they generate," *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004), it is worth mentioning that his findings are consistent with the opinion of JRES's "accounting employee[,] Yvette." Upon learning in February 2019 that BANA sought to reconcile operating costs payments, Yvette thought that 600 Cleveland was "going to owe [BANA] tens of thousands of dollars." *See* JSUF ¶ 30.

basic annual rent." Lease § 5 (Doc. 82-2) at 5. The lease obligated 600
Cleveland to, "[a]fter the end of each lease year, or such shorter accounting
period as [600 Cleveland] may determine in [its] sole discretion, [600
Cleveland] shall deliver to [BANA] a statement showing the amount of the
Building's Operating Cost for the subject period, and further showing [BANA's]
share thereof." *Id*. And any "determination made in good faith by [600
Cleveland] and not patently erroneous shall be binding." *Id*. The lease then
provided directions on how each party should address inevitable under- or
overpayment. *See id*.

BANA alleges that 600 Cleveland is in breach because it withheld
overpayments that BANA made towards its share of the operating costs of the
building. *See* Am. Answer & Countercls. ¶ 35 (Countercls.). There are two ways
that 600 Cleveland, by not crediting (or repaying) BANA for overpayments,
could potentially be in breach of its obligations in § 5. Under the first, 600
Cleveland fails to provide the reconciliation statement at the end of a given
lease year, resulting in BANA's overpayment for that year. Under the second,
600 Cleveland provides a reconciliation statement for a given lease year that
it made in bad faith or was patently erroneous, resulting in BANA's
overpayment. No party puts forth evidence or makes any argument that 600
Cleveland credited or repaid BANA for any overpayments. Both parties
assume and argue that 600 Cleveland did not. Thus, what remains for BANA

33

to show is that it overpaid for the years in question under either of the above scenarios. The parties, as explained below, misread the lease. Because the parties interpret the "good faith" and "not patently erroneous" provision to apply to estimates of future operating costs, they focus on the first manner in which BANA might have overpaid.

BANA points to Chelepis's report and testimony as evidence of its claim. Def.'s MSJ at 23–25. As part of his audit, Chelepis reviewed all BANA's relevant files and those files that 600 Cleveland provided in response to his repeated requests for documentation related to the lease and the building's operating costs. *See* Chelepis Report at 1–2. After his review, Chelepis concluded that 600 Cleveland provided the reconciliation statement for 2019 but not for 2020 and 2021. *Id.*; Chelepis Dep. 96:6–15.

In response, 600 Cleveland argues that BANA cannot prove its counterclaim and points to Jacob's declaration and deposition testimony that he sent statements to BANA detailing its proportion of the building's operating costs. *See* Pl.'s MSJ at 5–6; Pl.'s Resp. to MSJ at 15. But what Jacob sent was not a statement reconciling the estimated operating costs payments BANA made over the past year with the actual operating costs. Instead, Jacob sent "estimates of coming-year [operating costs] in summary." Jacob Decl. (Doc. 84-7) ¶ 9. At his deposition, Jacob testified that JRES provided the required reconciliation statements for each year. *See* Jacob Dep. (Doc. 84-5) 202:22–

203:24. He then clarified that he sent "what the operating expenses were, so

what the amount of the rent would be for the *forthcoming* lease year or partial

lease year." *Id.* 206:8–10 (emphasis added). The sample statement that 600

Cleveland provides confirms that these statements were estimates of future

rent and operating costs, not reconciliation statements. *See* Jacob Decl. Ex. 1

(Doc. 84-7) at 7.

Thus, the only evidence offered as to whether 600 Cleveland complied

with its obligations to provide reconciliation statements to BANA is Chelepis's

expert testimony. There is no genuine dispute of material fact as to whether

600 Cleveland timely provided the reconciliation statements for the years from

which BANA is not time-barred from recovering damages. The evidence is that

600 Cleveland did so only once—in 2019.[6]

600 Cleveland argues that JRES's calculations for the estimated

operating costs, which BANA paid, were made through reasonable

calculations, reliance on Jacob's experience in commercial building

management, and his business judgment. *See* Pl.'s MSJ at 6–7; Pl.'s Resp. to

MSJ at 16–17. Thus, they were made in good faith and were not patently

---

[6] As one might expect, the amount that Chelepis found that 600 Cleveland
overcharged BANA in 2019 after the reconciliation statement was substantially less
than the amounts in the other years. Chelepis Report at 8. In 2019, 600 Cleveland
purportedly overcharged BANA by only $3,234.04. *Id.* at 8, 16. The overpayments in
the other years for which Chelepis received documents from 600 Cleveland, *see supra*
note 4, averaged $20,430.80. *See* Chelepis Report at 8.

erroneous. *See* Pl.'s MSJ at 6–7; Pl.'s Resp. to MSJ at 16–17. 600 Cleveland does not clearly explain this argument; it just states that for these reasons it is entitled to summary judgment. *See* Pl.'s MSJ at 6–7, 9; Pl.'s Resp. to MSJ at 16–18. I interpret that argument to mean that, under the terms of the lease, good faith calculations that are not patently erroneous are still binding. Thus, according to 600 Cleveland, there could be no breach claim even if 600 Cleveland did not send the reconciliation statements. The problem is that the "good faith" and "not patently erroneous" provision applies to the reconciliation statements sent in accordance with § 5 of the lease, not to any estimates of future costs. Section 5 provides a set estimated payment for operating costs, and the only "determination" to be made is the amount that BANA truly owed based on the actual costs of the year and how that compared to the estimated amount. Outside of defending against any alleged overcharging for operating costs in 2019, when 600 Cleveland sent a reconciliation statement, this provision is of no help to 600 Cleveland.

Both parties appear to mistakenly perceive the "good faith" and "not patently erroneous" provision as applying to future operating costs estimates. *See, e.g.*, Pl.'s MSJ at 6–7; Def.'s Resp. to MSJ at 5–7. Thus, to the extent that any evidence exists regarding how 600 Cleveland calculated the 2019 reconciliation statement and whether it was done in good faith, neither party points to it. Proving entitlement to damages related to overcharging in 2019 is

36

BANA's burden, and in the absence of any evidence from which to support that the amount charged after reconciliation was not made in good faith or was patently erroneous, 600 Cleveland is entitled to summary judgment as to any damages from 2019. *See Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994).

For 2020 and 2021, BANA has put forth uncontroverted evidence that 600 Cleveland failed to timely provide the required reconciliation statements, and that 600 Cleveland overcharged BANA by a combined $35,063.17. *See* Chelepis Report at 8. Thus, BANA is entitled to summary judgment as to its breach claim but may recover damages only from 2020 and 2021.

## IV.   CONCLUSION

I grant BANA's motion for summary judgment as to 600 Cleveland's claim because restoration damages are barred by Florida law when higher than the diminution in value, and 600 Cleveland failed to present evidence of causation for lost rent damages. Because BANA's accounting expert, Chelepis, is qualified, uses reliable methodology, and would be helpful to the trier of fact, I deny 600 Cleveland's *Daubert* motion. After concluding that the statute of limitations bars BANA from recovering damages incurred before July 18, 2019, and accepting Chelepis's testimony, the only evidence regarding BANA's counterclaim for breach of contract establishes that there is no genuine dispute of material fact, and that BANA is entitled to judgment as a matter of law as to its overpayments in 2020 and 2021. Thus, I grant in part BANA's motion for

summary judgment as to its counterclaim and grant in part 600 Cleveland's
motion for summary judgment.

The following is therefore **ORDERED:**

1.    BANA's Motion for Summary Judgment (Doc. 81) is **GRANTED
      IN PART.** Specifically, the Court grants the motion regarding 600
      Cleveland's sole claim and BANA's breach of contract counterclaim
      for lease years 2020 and 2021. BANA's summary judgment motion
      is otherwise denied, including BANA's recoupment claim, which is
      denied as moot. Accordingly, Count II of BANA's Counterclaims
      (Doc. 24) is **DISMISSED as moot.**

2.    600 Cleveland's Motion for Summary Judgment (Doc. 85) is
      **GRANTED IN PART** only to the extent of 600 Cleveland's
      arguments that the statute of limitations prevents BANA from
      recovering damages from before July 18, 2019, and that BANA
      cannot prove its claim for damages from the 2019 lease year. 600
      Cleveland's Motion for Summary Judgment is otherwise
      **DENIED.**

3.    600 Cleveland's Chelepis *Daubert* Motion (Doc. 79) is **DENIED.**

4.    BANA's *Daubert* Motion (Doc. 80), 600 Cleveland's Taulbee
      *Daubert* Motion (Doc. 73), and 600 Cleveland's Ameli *Daubert*
      Motion (Doc. 78) are **DENIED as moot.**

5.   The Clerk is directed to **ENTER JUDGMENT**, which shall read:
     "Judgment is entered in favor of Bank of America, N.A., and
     against 600 Cleveland, LLC, in the amount of $35,063.17 and any
     prejudgment interest to be determined."

6.   No later than **fourteen days after the Clerk's entry of
     judgment** in accordance with this order, BANA is directed to file
     a motion establishing the amount of prejudgment interest it is
     owed, and, if it chooses, for entitlement to—though not the amount
     of—attorney's fees and costs. *See* Local Rule 7.01.

7.   The Clerk is further directed to **TERMINATE** all deadlines and
     to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on January 23, 2026.

Kathryn Kimball Mizelle
United States District Judge